UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

24-80079-CR-ROSENBERG/REINHART

Case No. _____

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 2
18 U.S.C. § 982(a)(7)

FILED BY ____MP____ D.C.

Jun 26, 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

**UNITED STATES OF AMERICA**

**vs.**

**ALICIA ANN HILLER,**

        **Defendant.**

_____/

## INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times material to this Indictment:

### The Medicare Program

1. The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.

2. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

3. Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each Medicare beneficiary was given a unique Medicare identification number.

4. Medicare covered different types of benefits, which were separated into different program "parts." Medicare Part A covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B covered, among other things, medical services provided by physicians, medical clinics, and other qualified health care providers, such as office visits, minor surgical procedures, and durable medical equipment ("DME"), that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

5. Health care providers, including DME suppliers, that provided and supplied items and services to Medicare beneficiaries were referred to as "providers." Providers were able to apply for and obtain a "provider number." Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for benefits, items, or services provided to beneficiaries.

6. Medicare would only pay for items and services that were medically reasonable and necessary, eligible for reimbursement, and provided as represented. Medicare would not pay claims for items and services that were procured through the payment of illegal kickbacks and bribes.

### Medicare Part B

7. CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

8. To receive Medicare reimbursement, providers had to make appropriate application to the MAC and execute a written provider agreement. The Medicare provider enrollment application, CMS Form 855S, was required to be signed by an authorized representative of the provider. CMS Form 855S contained a certification that stated:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [the provider]. The Medicare laws, regulations, and program instructions are available through the [MAC]. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute…).

9. CMS Form 855S contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare," and "will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

10. Payments under Medicare Part B were often made directly to the provider rather than to the beneficiary. For this to occur, the beneficiary would assign the right of payment to the provider. Once such an assignment took place, the provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

**Durable Medical Equipment**

11. Medicare Part B covered an individual's access to DME, such as off-the-shelf ankle braces, knee braces, back braces, shoulder braces, elbow braces, wrist braces, and hand braces (collectively, "braces"). Off-the-shelf braces required minimal self-adjustment for appropriate use and did not require expertise in trimming, bending, molding, assembling, or customizing to fit the individual.

12. A claim for DME submitted to Medicare qualified for reimbursement only if it was medically necessary for the treatment of the beneficiary's illness or injury and prescribed by a licensed physician or other qualified health care provider.

13. When filing a claim for DME with Medicare, providers were required to submit certain information relating to the beneficiary. The information necessary for a DME claim included:

   a. the type of service provided, identified by a Healthcare Common Procedure Coding System ("HCPCS") code;

   b. the date of service or supply;

   c. the referring physician's NPI;

   d. the charge for such services;

   e. the patient's diagnosis;

   f. the NPI for the DME entity seeking reimbursement; and

   g. certification by the DME provider that the supplies are medically necessary.

Claims seeking reimbursement from Medicare could be submitted in hard copy or electronically.

14. Further, before submitting a claim for an orthotic brace to the DME MAC, a supplier was required to have on file the following:

   a. written documentation of a verbal order or a preliminary written order from a treating physician;

   b. a detailed written order from the treating physician;

   c. information from the treating physician concerning the beneficiary's diagnosis;

   d. any information required for the use of specific modifiers;

   e. a beneficiary's written assignment of benefits; and

   f. proof of delivery of the orthotic brace to the beneficiary.

4

15. Medicare and MACs also had specific criteria to establish medical necessity for certain DME items, including those related to knees. For knee braces, such criteria included that the beneficiary must be ambulatory and have knee instability documented by certain objective testing; such criteria further specified that knee braces were not reasonable and necessary when patients only demonstrated pain or provided subjective descriptions of instability.

### The Defendant and Related Entities and Individuals

16. Lifeline Recruiting, Inc. ("Lifeline") was a company formed under the laws of Florida with its principal place of business in Boca Raton, Florida.

17. The defendant **ALICIA ANN HILLER** ("HILLER") was a resident of Pompano Beach, Florida, and the president of Lifeline.

18. Cure Healthcare, Inc., also known as Consults Direct ("Consults Direct"), was a company with its principal place of business in Newport Beach, California. Consults Direct was a purported marketing company targeting the Medicare-aged population to promote DME.

19. Sajid Geronimo, also known as Jay Geronimo, was a resident of Orange County, California. Sajid Geronimo owned and operated Consults Direct.

### COUNT 1
### Conspiracy to Commit Health Care Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1. The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2. From in or around August 2018, and continuing through in or around April 2019, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**ALICIA ANN HILLER,**

5

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with Sajid Geronimo, and others known and unknown to the Grand Jury:

    a.    to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

    b.    to knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

3.    It was a purpose of the conspiracy for the defendant and her co-conspirators to unlawfully enrich themselves by, among other things: (a) causing doctors to sign orders for DME that was not medically necessary and not legitimately prescribed in exchange for kickbacks and bribes; (b) submitting and causing the submission of false and fraudulent claims to Medicare for DME that was not medically necessary, not legitimately prescribed, and not eligible for reimbursement by Medicare; (c) concealing and causing the concealment of false and fraudulent

claims; and (d) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

**Manner and Means**

The manner and means by which the defendant and her co-conspirators sought to accomplish the objects and purpose of the conspiracy, included, among other things:

4. **ALICIA ANN HILLER** and others, through Lifeline, contracted with doctors and paid them to sign orders for DME, even though Hiller knew that many of the doctors were not reviewing the beneficiaries' medical records and were not making an actual assessment of medical necessity. **HILLER** described these doctors as "happy clickers" or "auto-clickers."

5. **ALICIA ANN HILLER** and others directed Lifeline doctors to a portal owned and operated by Sajid Geronimo, through Consults Direct, which supplied pre-prepared medical records for Medicare beneficiaries, recordings of calls that telemarketers had with those beneficiaries, and proposed orders for DME for those beneficiaries. The pre-prepared medical records often contained medical information that was contrary to the actual information provided by the beneficiaries in the recordings and that was otherwise false and fictitious.

6. **ALICIA ANN HILLER** and others solicited and received kickbacks and bribes from Sajid Geronimo, through Consults Direct, in exchange for the Lifeline doctors signing the pre-prepared DME orders for Medicare beneficiaries without regard to medical necessity and often without even reviewing beneficiaries' medical records or speaking with the beneficiaries.

7. **ALICIA ANN HILLER** and others paid kickbacks and bribes to doctors to sign the orders for DME for beneficiaries without regard to medical necessity and often without reviewing beneficiaries' medical records or speaking with the beneficiaries.

8. Sajid Geronimo, through Consults Direct, sold the signed DME orders that he purchased from **ALICIA ANN HILLER** to DME suppliers who used the orders to submit false and fraudulent claims, via interstate wire communications, to Medicare for DME that was not medically necessary and not eligible for reimbursement.

9. Between in and around September 2018 and continuing through in or around March 2019, **ALICIA ANN HILLER**, Sajid Geronimo, and others caused DME suppliers to submit thousands of false and fraudulent claims, via interstate wire communications, to Medicare for DME that was medically unnecessary and ineligible for reimbursements. Medicare paid more than $40,000,000 on those false and fraudulent claims.

10. From in or around September 2018, and continuing through in or around March 2019, **ALICIA ANN HILLER**, Sajid Geronimo, and others caused DME suppliers to pay Consults Direct a total of approximately $12,055,783 in kickbacks and bribes for signed orders for DME that was medically unnecessary and ineligible for reimbursement

11. From in or around September 2018, and continuing through in or around March 2019, **ALICIA ANN HILLER**, though Lifeline, received approximately $2,332,000 in kickbacks and bribes from Sajid Geronimo, through Consults Direct, in exchange for causing doctors to sign orders for DME that was medically unnecessary and ineligible for reimbursement.

12. **ALICIA ANN HILLER**, Sajid Geronimo, and their co-conspirators used the proceeds of the conspiracy for their own use and benefit, the use and benefit of others, and to further the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-5
### Health Care Fraud
### (18 U.S.C. § 1347)

1. The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2. From in or around August 2018, and continuing through in or around December 2019, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**ALICIA ANN HILLER,**

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said healthcare benefit program.

### Purpose of the Scheme and Artifice

3. The Purpose of the Conspiracy section of Count 1 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein as a description of the purpose of the scheme and artifice.

### The Scheme and Artifice

4. The Manner and Means section of Count 1 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

**Acts in Execution or Attempted Execution of the Scheme and Artifice**

5. On or about the dates set forth as to each count below, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant, **ALICIA ANN HILLER**, did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program, in that the defendant submitted and caused the submission of false and fraudulent claims to Medicare, seeking the identified dollar amounts, and representing that such benefits, items, and services were medically necessary and eligible for Medicare reimbursement:

| Count | Approx. Date of Signing the Orders | Medicare Beneficiary | Lifeline Practitioner Who Signed the Orders | Product Codes | Approx. Date of Claim Submission | Total Approx. Amount Paid on the Orders |
|---|---|---|---|---|---|---|
| 2 | 3/9/2019 | E.H. | H.D. | L1851, L2397, L1851, L2397 | 3/18/21 | $1,586.92 |
| 3 | 3/14/2019 | B.W. | U.C. | L1851, L2397, L1851, L2397 | 3/20/19 | $1,574.96 |
| 4 | 3/14/2019 | J.S. | U.C. | L1851, L2397, L1851, L2397 | 3/20/19 | $1,574.96 |
| 5 | 3/19/2019 | B.J. | H.D. | L1851, L2397 | 3/22/19 | $793.46 |

In violation of Title 18, United States Code, Sections 1347 and 2.

### FORFEITURE ALLEGATIONS
### (18 U.S.C. § 982(a)(7))

1. The allegations of this Indictment are hereby re-alleged and by this reference fully incorporated herein for alleging criminal forfeiture to the United States of America of certain property in which the defendant, **ALICIA ANN HILLER**, has an interest.

20. Upon conviction of a violation, or a conspiracy to commit a violation, of Title 18,

10

United States Code, Sections 1343 and 1347, as alleged in this Indictment, the defendant shall forfeit to the United States of America any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such violation pursuant to Title 18, United States Code, Section 982(a)(7).

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures outlined at Title 21, United States Code, Section 853, as made applicable by Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

_____
FOREPERSON

_____
MARKENZY LAPOINTE
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

GLENN S. LEON, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
RAYMOND E. BECKERING III
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

ALICIA ANN HILLER,

_____/
Defendant.

CASE NO.: 24-80079-CR-ROSENBERG/REINHART

**CERTIFICATE OF TRIAL ATTORNEY**

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of new counts _____

**Court Division** (select one)
☐ Miami   ☐ Key West   ☐ FTP
☐ FTL     ☒ WPB

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.

3. Interpreter: (Yes or No) No
   List language and/or dialect: _____

4. This case will take __5__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)
   I   ☒ 0 to 5 days
   II  ☐ 6 to 10 days
   III ☐ 11 to 20 days
   IV  ☐ 21 to 60 days
   V   ☐ 61 days and over

   (Check only one)
   ☐ Petty
   ☐ Minor
   ☐ Misdemeanor
   ☒ Felony

6. Has this case been previously filed in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____

7. Has a complaint been filed in this matter? (Yes or No) No
   If yes, Magistrate Case No. _____

8. Does this case relate to a previously filed matter in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____

9. Defendant(s) in federal custody as of _____

10. Defendant(s) in state custody as of _____

11. Rule 20 from the _____ District of _____

12. Is this a potential death penalty case? (Yes or No) No

13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No

14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No

15. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No

16. Did this matter involve the participation of or consultation with now Magistrate Judge Marta Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? No

By: _____
RAYMOND E. BECKERING III
DOJ Trial Attorney
Court ID No.   A5503174

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

Defendant's Name: _____ALICIA ANN HILLER_____

Case No: _____

Count #: 1

Title 18, United States Code, Section 1349

Conspiracy to Commit Health Care Fraud and Wire Fraud
* Max. Term of Imprisonment:  20 years
* Mandatory Min. Term of Imprisonment (if applicable):  N/A
* Max. Supervised Release:  3 years
* Max. Fine:  $250,000 or twice the gross gain or loss from the offense

Counts #: 2 – 5

Title 18, United States Code, Section 1347

Health Care Fraud
* Max. Term of Imprisonment:  10 years as to each count
* Mandatory Min. Term of Imprisonment (if applicable):  N/A
* Max. Supervised Release:  3 years
* Max. Fine:  $250,000 or twice the gross gain or loss from the offense

*Refers only to possible term of incarceration, supervised release and fines.  It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.